

# In the
# Missouri Court of Appeals
# Western District

STATE OF MISSOURI,

          **Respondent,**

v.

PATRICIA PREWITT,

          **Appellant.**

**WD81759**

**OPINION FILED:**

**MAY 21, 2019**

**Appeal from the Circuit Court of Pettis County, Missouri**
**The Honorable Robert Lawrence Koffman, Judge**

**Before Division Three: Thomas H. Newton, Presiding Judge, Anthony Rex Gabbert, Judge,**
**Edward R. Ardini, Jr., Judge**

Patricia Prewitt appeals the circuit court's denial of her Motion for Post-Conviction DNA Testing which requested the testing of evidence related to Prewitt's 1985 conviction for capital murder.[1] In Prewitt's sole point on appeal she contends the circuit court clearly erred in denying her motion on the grounds that the court, 1) did not properly assess whether a reasonable probability exists that Prewitt would not have been convicted if exculpatory results were obtained through the requested DNA testing, 2) erroneously applied the standard for release under Section

---

[1] Section 565.001, RSMo 1978 (repealed effective October 1, 1984). All other statutory references are to the Revised Statutes of Missouri as updated through 2017, unless otherwise noted.

547.037, not the standard for testing under Section 547.035, and 3) relied on factual errors and extrajudicial information in reaching its decision.[2]  We affirm.

## Trial Evidence

Patricia Prewitt and William Prewitt (Bill)[3] were married August 8, 1968.  In 1976, the couple purchased a lumber yard in Holden, Missouri and jointly ran the business.  By 1984, the couple had five school-aged children.  In the early morning hours of February 18, 1984, Prewitt and Bill returned to their home after an evening of socializing with friends.  Prewitt testified that, sometime after both she and Bill fell asleep, she was awakened by a sound like thunder.  She was grabbed by the hair and pulled from bed by an unknown assailant.  She could feel something sharp at her throat.  The intruder pulled her pajama bottoms and underwear off and was fumbling with his belt.  Prewitt could tell the assailant was getting very nervous and very angry.  He told Prewitt to stop crying.  He abandoned his attempt to rape Prewitt, left, and Prewitt never saw him again.

After the intruder left, Prewitt checked on Bill who was making gurgling noises.  She went into the children's rooms and found them all asleep.  She went back to check on Bill but was unable to see in the bedroom because the lights were not working.  She retrieved a flashlight from the truck outside and, after seeing blood on her husband, woke the children.  She told the children there was a small fire and got them dressed.  Prewitt took the children outside to the car and told them to lock the doors.  She went back inside the home and again checked on Bill.  She touched

---

[2] Prewitt's three stand-alone allegations of error should have been set forth in three separate points on appeal. "Multifarious points relied on are noncompliant with Rule 84.04(d) and preserve nothing for review." *Griffitts v. Old Republic Insurance Company*, 550 S.W.3d 474, 478 n.6 (Mo. banc 2018).  Nevertheless, as we prefer to decide cases on the merits where an appellant's argument is readily understandable, we exercise our discretion to review the merits of Prewitt's claims.

[3] As Patricia Prewitt and William Prewitt share the same last name, William Prewitt will be referenced as "Bill," the name he was called by friends and family.  No familiarity or disrespect is intended.

him and he felt cold. She ran back outside and drove to a neighbor's home for help. She saw a light on at Cliff and Patricia Gustin's home. Prewitt had blood on her hand from touching Bill, and washed it off at the Gustin's as she did not want the children to see the blood.

Bill was shot with a .22 caliber repeater rifle which was normally kept unloaded in the Prewitts' bedroom closet behind a chest of drawers. Bullets were stored in a bedroom drawer and in Prewitt's jewelry box. The rifle was found three days later in the Prewitts' pond; it was fifteen feet from the bank in eleven inches of water. A footprint from Prewitt's boot was observed nearby on the bank and, after the pond was drained, another footprint was found on the pond bottom near the rifle. The phone line in the Prewitt bedroom had been cut, and power to the home had been turned off at the basement breaker box.

Dr. James Bridgens, a forensic pathologist, testified at Prewitt's trial that in his expert opinion Bill was asleep immediately before he was shot twice in the head. Bill was breathing after the first shot, but the second shot would have ended all bodily functions including any ability to breathe; the second shot severed the brain stem and caused instant death. The angle of the second shot indicated the gun would have been held "almost on top" of anyone else sleeping in bed with the victim.

Bridgens testified that the cut marks found on Prewitt's neck after the alleged attack appeared to be "hesitation marks," described as superficial marks in the skin with a very uniform parallel pattern, seldom going deeper than through the skin, and found in a location accessible to the individual. Bridgens described Prewitt's neck wounds as "superficial lacerations, actually little more than scratches," with "a unique parallel pattern to them." Bridgens found the marks characteristic of self-inflicted hesitation marks. He found the marks inconsistent with wounds that might be expected from an attempted rapist wielding a knife in total darkness.

3

Prewitt initially denied any extramarital affairs, but ultimately admitted four affairs after confronted with proof by law enforcement. She testified to those at trial. She attributed the affairs, in part, to having been raped by three unknown assailants in May of 1974 in Sedalia, Missouri. She testified that her husband dropped her off to shop and the two agreed to meet at a nearby park at a given hour. Prewitt was walking through a residential neighborhood admiring the architecture of old homes when three men pulled her into the bushes and raped her. Prewitt testified, "And an older woman came out of her house and she was so cute, she scared them away. She brought me inside made me a cup of tea and helped me clean up." Prewitt's husband came to pick her up and they decided to never tell anyone of the rape. The first time Prewitt revealed the rape was to defense counsel in explanation of her extramarital affairs. Prewitt testified that, after the rape, although Bill was sympathetic, he became distant and no longer desired sexual intimacy. Prewitt sought comfort from other men and, at trial, admitted to having sexual relations with J.H., R.H., R.M., and D.B.[4]

Prewitt admitted to telling her paramours that she wanted a divorce from Bill, and leading them to believe Bill physically beat her. She never told the men about the rape which prompted the extramarital affairs because, it "hurt too much to tell." Prewitt testified that, contrary to what she told her extramarital partners, Bill had never beaten her and "was a kind and gentle person." She lied to the men because she did not want them to think badly of her.

J.H. testified that he first met Prewitt at her place of business and they engaged in a sexual affair that lasted several months, meeting at different places including Prewitt's residence in Holden and a motel in the city. J.H. testified that Prewitt told him that she wished Bill would be

---

[4] Prewitt testified that she only had sexual intercourse with D.B. once; D.B. did not testify at Prewitt's trial.

4

killed in a car accident or some type of accident, and that she knew where the gun was in the house and thought about killing Bill in his sleep. She expressed these thoughts to J.H. at least twice. J.H. testified that he did not believe Prewitt when she discussed wanting Bill dead. J.H.'s and Prewitt's affair ended when Bill caught J.H. at the Prewitt home.

Prewitt testified that J.H.'s statements regarding their sexual relationship were essentially correct. Although she did not remember telling J.H. that she wished Bill dead, she testified, "I have said things like that I'm sure." She explained that during the "bad times" she was sure she had said she "wished he got run over by a truck or something like that." When asked if Prewitt had actually wished Bill dead she testified, "No. I was confused, I don't know – I don't know. I never wished he was dead. We needed him too much. The kids needed him too much." When asked on cross-examination why J.H. would state that Prewitt told him that she thought about killing Bill, she stated that she did not know because, "[J.H.'s] a good man. [J.H.'s] a good person. I don't know what you did to him to make him say that."

R.H. testified that he became acquainted with Prewitt at the Prewitt's lumber yard as he worked at a lumber yard across the street. R.H. had sexual intercourse with Prewitt on three occasions, once at a motel and twice at Prewitt's residence while Bill was at work and a ball game. Prewitt's children were in bed on one occasion and outside on another. R.H. testified that Prewitt asked R.H. if he knew of a way of getting rid of Bill. Prewitt told R.H. that she and Bill had plenty of insurance money that would allow R.H. to build a lumber yard and Prewitt to become wealthy. R.H. testified that he did not place any credibility in Prewitt's statements, and that the affair occurred approximately seven years prior to trial. R.H.'s affair with Prewitt ended when R.H. moved away from the area.

5

R.H. was cross-examined on the fact that police promised R.H. he would not have to appear in court if he signed a statement, and defense counsel suggested R.H. had been coerced into signing the statement. R.H.'s credibility was attacked with a 1969 conviction for stealing cattle in Mercer County.

Prewitt testified that most of what R.H. testified to was true, although they were only "together" two times, not three. When asked about R.H.'s testimony that, if he would get rid of Bill they would buy a lumber yard and move off, Prewitt testified that R.H. used to talk about wanting to buy a lumber yard down in the Ozarks or Warsaw. She always considered the possibility of him buying his own business slim. She stated that she never asked him to kill Bill.

R.M. testified that he had an ongoing affair with Prewitt for a number of years while residing next door to the Prewitt residence when the Prewitts lived in Lee's Summit. He testified that, while Bill was at work, R.M. would go to the Prewitt residence, help with gardening, and work around the house. R.M. knew Bill as Bill had previously given him a job. R.M. considered Bill a good guy and a friend. According to R.M., he engaged in sexual intercourse with Prewitt at her home approximately once a week. Prewitt told R.M. that Bill did not sexually satisfy her. After the Prewitts moved to Holden, the relationship continued. R.M. testified that Prewitt told him that, when she was in high school, she was forcibly raped at knife-point by a group of guys at a drive-in. She discussed no other incidents of being raped.

R.M. testified that, in June or July of 1982, while working on the Prewitt's truck at their residence, R.M. went into the kitchen to get some water. Prewitt was crying in the kitchen. She told R.M. that Bill had been beating her and making Prewitt have sex. R.M. told Prewitt that she and Bill should separate or divorce. Prewitt told him that she did not want to because Bill would end up getting the children and the lumber yard, and she would have nothing. Prewitt told him

that she needed to have Bill killed and suggested R.M. assist. She proposed that R.M. come to the home one night and set a barn on fire. Prewitt would then send Bill outside to check on the fire, and R.M. would shoot Bill. Prewitt offered R.M. $10,000 to be paid from life insurance proceeds. R.M. testified that he told Prewitt it was a crazy idea, and that he did not believe she was saying those things.

After Bill's death approximately nineteen months later, R.M. spoke with Prewitt at the Prewitt lumber yard and told her that he had spoken with authorities regarding the statements she had made. Prewitt asked R.M. to tell authorities he was lying, but R.M. told her he had already given a statement. R.M. then told Prewitt that if she married him, he would not have to testify against her in court; he would divorce his present wife and marry her. R.M. testified that, at first, he lied to authorities about his affair with Prewitt to protect both Prewitt and himself, but his conscience started bothering him so he ultimately admitted the affair and Prewitt's statements.

R.M. admitted to previously smoking marijuana and taking heroin and LSD. R.M. also testified that he had fired one of the Prewitts' guns. R.M. testified that he and his wife were at the Prewitt home for dinner two weeks prior to Bill's murder.

Prewitt testified that R.M.'s testimony regarding a lengthy affair was untruthful, and that they only had sexual relations on four occasions. She stated that, even after the affair was over, R.M. would tell Prewitt he loved her and believed she loved him. Prewitt confirmed that, after Bill's death, R.M. visited the lumber yard and told her that he had spoken with police. Prewitt testified, "I just listened because I had no idea what he was talking about." R.M. then told her that he had a good idea of how he could get out of testifying against her and said that, if she married him, legally a husband could not testify against his wife. Everything would then be fine and they could live on the insurance money. Prewitt responded, "Rick, you're married!" R.M. replied that

7

his wife was fine with the plan. Prewitt testified that she could not believe R.M. would say such things and told him, "I would rather rot in prison forever than to ever touch him much less marry him."

Prewitt testified that she never asked R.M. to kill her husband. She said that R.M. scared her and that he was "weird." She said R.M. sees things differently than other people and she never knew what he was going to do. Prewitt testified, "Especially I never told Bill about him." Prewitt was afraid R.M. would tell Bill about their relationship and so, "I couldn't tell him to very bluntly never come back, so he would come back and visit. I would have to feed him supper and try to avoid him, but still be nice."

Two life insurance policies on Bill, first issued in the late 1970's, were in effect at Bill's death – one for $43,488.78 and one for $49,987.31. Richard Reimer of I.C.H. Corporation testified that claims on these policies had been filed by Prewitt as primary beneficiary. There had also been a policy on Bill through American Family Insurance Agent Teddy Guinn, which lapsed in 1981. Through Guinn, the Prewitts had active life insurance policies on Prewitt and the children. On February 16, 1984, two days before Bill's murder, Guinn went to the lumber yard and spoke with both Bill and Prewitt about keeping Prewitt's and the children's policies in force as they had recently lapsed. He also discussed Bill's policy that lapsed in 1981. Bill confirmed with Guinn that he had insurance elsewhere for himself, and Prewitt paid a double premium the following day to keep Prewitt's and the children's policies active.

At trial, Prewitt maintained her innocence and attacked the police investigation as shoddy and biased. The defense proposed that chief investigator, Kevin Hughes made up his mind about Bill's murderer before investigating, and was predisposed to believe a family member committed the murder based on statistics and a book he had read. The defense attacked Hughes's search for

8

insurance papers within two hours of responding to the crime scene, as well as Hughes collecting Alfred Hitchcock books from the bedroom of the crime scene. The defense criticized Hughes for not taping Prewitt's interviews and then testifying to provocative and sexually suggestive statements Prewitt allegedly made. These included that Prewitt had extramarital relations "at least once a day and sometimes three or four times a day," that her "fire burns hotter than most people," and that she would not tell the truth unless caught red-handed.

The defense argued that little effort was made to look for an intruder, and police inadequately searched for fingerprints. The defense attacked the police for not focusing on marks found on the front door that could have suggested forced entry. The defense argued that police focused on lack of tire tracks at the Prewitt home, but failed to investigate nearby roads for tire tracks. The defense discussed that Prewitt's daughter, Sarah, testified that when her mother took her out of the home the morning of the murder, she heard something downstairs and the basement door was closed. She also saw a light in the basement. When neighbor Cliff Gustin arrived at the home with police, the basement door was open.

The defense criticized the search of the Prewitts' bedroom as sloppy, only finding a shell casing after it fell out of a chair when an investigator sat down. The defense criticized the police for failing to conduct hair analysis. Mary O'Roark, a family friend who cleaned the Prewitt bedroom after Bill's death, testified that she found hairs on the bedroom floor. The defense talked about Patricia Gustin's testimony that, by 9:00 a.m. the morning of the murder, she received a call from another neighbor who said Prewitt had murdered Bill; the defense told the jury that such information could have only come from the police. The defense attacked as irrational the State's theory that Prewitt was interested in life insurance money, because the family debt far exceeded life insurance proceeds. The defense attacked the prosecution's focus on Prewitt's extramarital

affairs, suggesting the police strong-armed the men into falsely implicating Prewitt by telling them they were suspects and threatening to prosecute.

The defense attacked the testimony of R.M., stating that R.M.'s heroin and LSD use impacted his brain and rationality. Further, R.M. wanted to force Prewitt to marry him, had been in the Prewitt home within two weeks of Bill's death, was familiar with the area around the house and pond, and was late for work the morning of the murder. The defense stated that, "if I had to draw a psychological profile of someone who would go in and shoot Bill Prewitt in the head it would be R.M. or one of his doper buddies." The defense suggested R.M. could have loaded the gun when he was in the home two weeks prior to Bill's death. The defense criticized the prosecution's focus on Prewitt's boot print near the gun as there was no mud on Prewitt's boots and Sheriff Norman testified that he could not walk in that area without his boots getting stuck in the mud.[5]

**Procedural History**

The jury convicted Prewitt of capital murder for the shooting death of her husband. She was sentenced to life in prison without eligibility for probation or parole for fifty years. We affirmed the conviction in *State v. Prewitt*, 714 S.W.2d 544 (Mo. App. 1986). Thereafter, Prewitt filed a Rule 29.15 motion seeking to vacate her conviction. We affirmed the denial of that motion in *Prewitt v. State*, 781 S.W.2d 92 (Mo. App. 1989). Prewitt moved in federal court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition was denied and the Eighth Circuit affirmed that denial. *Prewitt v. Goeke*, 978 F.2d 1073 (8th Cir. 1992).

---

[5] Prewitt, however, testified that the afternoon before the murder she left those boots outside the family room door because they were muddy after checking the erosion level of the pond.

On November 27, 2017, Prewitt filed a Motion for Post-Conviction DNA Testing in the Pettis County Circuit Court. She alleged that DNA analysis on previously untested evidence would provide exculpatory evidence demonstrating Prewitt's innocence and identifying her husband's actual killer. Prewitt argued that the prosecution's case against her relied heavily on attacks on Prewitt's character/credibility and the lack of an alternate suspect. Prewitt contended that the State argued at trial that Prewitt "set the stage" to make it seem like an intruder murdered her husband by inflicting marks on her own throat, severing the phone line, and hiding the murder weapon. Prewitt contended that police failed to conduct a thorough investigation and focused primarily on her as a suspect, neglecting to preserve and recover evidence and creating a situation in which Prewitt's account could not be corroborated. Prewitt contended that the requested DNA could corroborate her story regarding an unknown intruder, creating a reasonable probability that the jury would not have convicted her. Prewitt requested testing of the following:

(1) Pajama top of Patricia Prewitt (Item 18)[6]

(2) Pajama bottom of Patricia Prewitt (Item 19)

(3) Telephone and cord from master bedroom (Item 9)

(4) Telephone and cord from downstairs hallway (Item 13)

(5) "Veri Veri Sharp" serrated knife recovered from yard (Item 16)

(6) St. Regis Knife found behind cushion of love seat in family room (Item 1B)

(7) Paring knife (Item 3D)

(8) Brown towel (Item 6D)

---

[6] Item numbers correspond to Property Records used by the Johnson County Sheriff's Office in their investigation.

11

(9) Cut & pulled victim hair samples (Item 20)

(10)    Pillow and pillow case from under victim's head (Item 3)

A hearing on Prewitt's motion was held March 14, 2018. After argument and consideration of Prewitt's motion, the court files, the trial transcript, the post-conviction file, and appellate decisions, the court denied Prewitt's motion on May 3, 2018. The court stated that "[i]n analyzing the evidence presented and what the defendant hopes to receive from DNA testing it is necessary to recognize the probative evidence that is known." The court discussed that someone else's DNA on Prewitt's pajamas, knives, telephone cords, and a piece of cloth found at the pond would not prove that Prewitt did not kill her husband. The motion court discussed that no item tested by DNA would disprove that Prewitt lied about having affairs until law enforcement presented proof, Prewitt's boot print at the pond by the murder weapon, or the incredibility of her story about hearing breathing and gurgling by her husband after he was shot. The motion court concluded that the trial evidence showed Prewitt's guilt regardless of the results of any DNA tests, and Prewitt failed to meet her burden of proving the test results would show her innocence.

This appeal follows.

**Standard of Review**

"We review a circuit court's rulings on motions for post-conviction DNA testing under the same standards applied in post-conviction proceedings under Supreme Court Rules 24.035 and 29.15." *Belcher v. State*, 364 S.W.3d 658, 662 (Mo. App. 2012). Therefore,

> 'Denial of a post-conviction motion for DNA testing is reviewed to determine whether the motion court's findings of fact and conclusions of law were clearly erroneous. The motion court's findings and conclusions are clearly erroneous only if, after review of the record, the appellate court is left with the definite and firm impression that a mistake has been made.'

12

*Id.* (quoting *State v. Ruff*, 256 S.W.3d 55, 56 (Mo. banc 2008).

**Reasonable Probability Assessment**

Prewitt argues that the motion court did not properly assess whether a reasonable probability exists that Prewitt would not have been convicted if exculpatory results were obtained through the requested DNA testing. She contends that the court was required to consider the impact her requested DNA would have had on the jury and failed to do so, citing statements by the court that the only way to determine what a jury would do is to retry the case. Prewitt argues that, through DNA testing on the requested items, "a third-party DNA profile could be developed." Because the State repeatedly attacked her account of an intruder, presence of a foreign DNA profile of an "unknown male" on these items would corroborate her account and exonerate her. Exculpatory DNA would restore her credibility in the mind of the jury after being vigorously and unfairly attacked during the State's case. Further, "if DNA from the physical evidence secured in relation to the crime were to match a profile in the Combined DNA Index system (CODIS) national database or the state database, DNA testing could prove Mrs. Prewitt's innocence and identify the actual perpetrator." She argues that if testing on multiple items of evidence indicated a single unknown male source, a jury would logically have concluded that Prewitt was telling the truth about an intruder murdering her husband.

Section 547.035.1 provides that, "[a] person in the custody of the department of corrections claiming that forensic DNA testing will demonstrate the person's innocence of the crime for which the person is in custody may file a postconviction motion in the sentencing court seeking such testing." As relevant here, the motion must allege facts demonstrating that "[a] reasonable probability exists that the movant would not have been convicted if exculpatory results had been

13

obtained through the requested DNA testing." §547.035.2(5).[7] Unless it appears from the motion that the movant is not entitled to relief, or the court finds that the files and records of the case conclusively show the movant is not entitled to relief, the court shall issue to the prosecutor an order to show cause why the motion should not be granted. §547.035.4. Upon issuance of the show cause order, the court clerk is to notify the court reporter to prepare and file the trial transcript if it has not been prepared or filed. §547.035.5. The court shall order appropriate testing if the court finds a reasonable probability exists that the movant would not have been convicted if exculpatory results had been obtained through the requested DNA testing and movant is entitled to relief. §547.035.7.

The court's Findings of Fact and Conclusions of Law show that the court considered the impact exculpatory DNA evidence might have had on the jury. The court's findings discuss the evidence which disproves Prewitt's trial claims and ultimately states that "[i]t is this Court's opinion that one of the reasons that the jury found Ms. Pruitt [sic] guilty was because she was caught in so many lies." In support of this statement, the court pointedly discusses the evidence the jury had before it to consider, including Prewitt's denial of extramarital affairs until proven by law enforcement, Prewitt stating she heard her husband breathing and making sounds after being shot (although evidence showed the second shot would have immediately ceased Bill's bodily functions), the improbability of Prewitt's account that the alleged attacker was able to see in the dark to find a hidden rifle (and separately hidden ammunition) and then commit the other acts Prewitt stated the intruder committed, and Prewitt's boot print next to the disposed murder weapon. Contrary to Prewitt's assertions, it is clear from the court's findings that the court did weigh the

---

[7] The State concedes that all additional elements required for DNA testing under Section 547.035 were met.

14

impact of exculpatory DNA results on the jury, ultimately concluding that, "No item to be tested by DNA would disprove this evidence."

Prewitt suggests that, because the court did not agree with the speculations offered by Prewitt as to how DNA evidence could have impacted the jury, the court failed to consider jury impact. Prewitt posits, "For example, suppose that ejaculate is found on Mrs. Prewitt's pajamas that matches the DNA profile of DNA extracted from a knife recovered from the crime scene and a convicted murderer in the FBI CODIS database. That would have mattered to a jury." Yet, the court was not required to accept or explore unreasonable speculations. Prewitt's testimony at trial was that the intruder fumbled with his belt buckle and ultimately abandoned his attempt to rape her. Hence, any ejaculate found on Prewitt's pajamas, based on Prewitt's account, could not be from the alleged intruder.

Prewitt suggests in her brief that one of Prewitt's former lovers, R.M., should have been a prime suspect because he was in love with Prewitt, lied to police about the affair when first interviewed, and handled the murder weapon. She states, "Nonetheless, the police and prosecutor never pursued R.M. as a suspect," inviting the inference that, if R.M.'s DNA is found on the items requested for testing, Prewitt's story would be more credible, requiring the conclusion that a jury would have reached a different result. Yet, pursuing R.M. as a suspect would have been illogical as Prewitt insisted the assailant was unknown to her. Prewitt was partially able to see the man who allegedly attacked her and observed he had a slight growth of beard. She described that he wasn't big and he wasn't small. She did not recognize his voice. He smelled like cigarettes and something similar to motor oil. She told police that she had no idea who he was. R.M., however, was no stranger to Prewitt as he visited her home regularly and ate at the Prewitt home two weeks prior to the murder. Prewitt never suggested R.M. as a suspect during the police investigation. Notably,

15

at trial the defense suggested that R.M. or one of his "doper buddies" killed Bill, explaining that R.M. had the means and motive to do so. The jury convicted Prewitt anyway. Although the defense suggested R.M. was the most likely perpetrator, R.M. was not on trial. The jury could have believed R.M. assisted with Bill's murder and still convicted Prewitt. Given the evidence, if R.M.'s DNA was found on the items requested for testing, there is still no reasonable probability Prewitt would not have been convicted of Bill's murder.

Prewitt complains that investigators did not do enough to find evidence that would have supported her defense of an unknown intruder, and then used the lack of evidence (no foreign tire tracks, footprints, or evidence of forced entry) to build its case. Prewitt contends her bygone extramarital affairs were merely salacious side details used by the prosecution to further discredit her and secure a conviction. She urges that, for these reasons, DNA testing is necessary and there is a reasonable probability it would have produced a different verdict if available at trial. We disagree. These assertions mischaracterize and ignore the wealth of trial evidence against her. The extramarital affairs were highly relevant as Prewitt told three of her paramours that she wanted her husband dead, solicited the assistance of two to kill her husband, and revealed to one a detailed plan to accomplish this. Prewitt's contention that investigators never looked beyond Prewitt for suspects is belied by the record. The defense acknowledged at trial that investigators sought out, as suspects, a man by the name of W.W., an unnamed foreign exchange student, and the men Prewitt had sexual affairs with.

Moreover, every allegation Prewitt makes with regard to investigatory failures, law enforcement pressure for witness cooperation, and the insignificance of bygone extramarital affairs, was posited to the jury during Prewitt's trial. The jury still found, beyond a reasonable doubt, Prewitt guilty of Bill's murder. The fact that the jury convicted Prewitt in spite of these

16

defense arguments must be considered in determining how the jury would have reacted to the DNA evidence Prewitt seeks. The record is clear that the court considered the entire body of evidence in reaching its assessment as to the reasonable probability of a different trial outcome if DNA evidence was before the jury.

## Applicable Standard – Section 547.035

Prewitt contends that the court erroneously applied the standard for release under Section 547.037, instead of the standard for testing under Section 547.035, when it concluded that Prewitt's innocence must be provable before DNA testing is ordered. She contends that Section 547.035 only requires that a reasonable probability exist that the movant would not have been convicted if exculpatory results had been obtained, and the court erred in requiring Prewitt to prove her innocence.

We find that the motion court's comments regarding DNA's inability to prove Prewitt's innocence were made in the context of whether a reasonable probability exists that Prewitt would have been convicted if exculpatory results had been obtained. Section 547.035.8 requires the court to issue findings of fact and conclusions of law. Because the court's ultimate ruling depends on the probability of conviction if exculpatory results are obtained from DNA testing, the court must consider all evidence and is not barred from comparing the nature of that exculpatory evidence to the trial evidence. While we agree that Prewitt is not required to prove actual innocence to obtain testing,[8] we find the record supports the court's conclusion that no reasonable probability exists

---

[8] "To be entitled to such testing, the movant need not conclusively prove his innocence." *Weeks v. State*, 140 S.W.3d 39, 50 (Mo. banc 2004).

that Prewitt would not have been convicted if the DNA evidence Prewitt seeks was available at trial.

The primary type of DNA evidence Prewitt seeks is "touch DNA." Prewitt explained at the motion hearing that, if it could be shown that touch DNA of the same person could be found on the phone cords, Prewitt's pajamas, and knives in the home (admitting there was no proof any of the knives were used in the crime), this "redundancy" would substantiate her allegations. Her primary quest is to uncover exculpatory results consisting of "the redundancy of what the collective universe of DNA means in comparison to what Ms. Prewitt said." Yet, there is no dispute that touch DNA testing was unavailable at the time of Bill's murder. Consequently, the handling of evidence in 1984 may have been very different than present day investigations where authorities are mindful of DNA preservation and protect against contamination. The State argued at the motion hearing that, in this case, Sheriff's officers, prosecutors, evidence experts, and even jurors may have touched the evidence leaving their own touch DNA. Prewitt did not dispute this.

Even if all known individuals who touched the evidence could be isolated and a redundant DNA profile of an unknown[9] individual extracted, such results might only show that Prewitt finally found someone to help her carry out Bill's murder. The only possible way DNA evidence could be truly exculpatory would be if it were linked to an unknown person in the FBI's database, Prewitt could prove that individual killed Bill, and Prewitt could prove she was not in collusion with that

_____

[9] Prewitt was clear that the assailant was unknown to her.

individual.[10]  Given the wealth of evidence against Prewitt, as well as all considerations before the jury, there is simply no reasonable probability of a different trial outcome, even if the requested DNA testing were to show redundant DNA profiles of an unknown individual.

The motion court did not clearly err in concluding that Prewitt failed to establish that DNA testing would have created a reasonable probability of a different outcome.

### Factual Errors and Extrajudicial Information

Prewitt contends that the motion court clearly erred in denying her motion for DNA testing by relying on factual errors and extrajudicial information in reaching its decision, thus failing to appear impartial in assessing the motion.  Prewitt argues that, during the March 14, 2018, hearing, the judge noted that he remembered the Prewitt case and attended portions of the 1985 trial. Prewitt contends that the court incorrectly recounted important aspects of her testimony at the hearing and in its decision denying her motion.  Prewitt argues that recusal of the judge was required because the court relied on factual errors stemming from extrajudicial experiences and gratuitously offered personal opinions of Prewitt's credibility and character such that the judge's impartiality might reasonably be questioned.

We have reviewed the judge's comments and find no grounds for recusal.  The judge's recollections as to Prewitt's statements to investigators were accurate, as the judge stated that if Prewitt had not personally testified to making those statements, someone else had.  Indeed,

---

[10]  In *Matney v. State*, 110 S.W.3d 872, (Mo. App. S.D. 2003), 'the State's theory and the evidence before the trial court did not preclude the possibility that someone else other than Movant and the victims were at the scene of the crimes.'  For that reason, 'even if DNA testing had been accomplished and showed blood not attributable to either Movant or the victims, that does not lead to a conclusion that the DNA results would have been exculpatory or that a reasonable probability existed that Movant would not have been convicted.'

*Belcher v. State*, 364 S.W.3d 658, 665 (Mo. App. 2012).

19

someone else had. The court's statement that, "She testified that the shots are what woke her up," is not inaccurate. Although Prewitt testified that she awoke to what she thought was thunder, and on cross examination stated that she did not know for sure if it was two gunshots that woke her, it is reasonable to infer by her testimony that the gunshots woke her as Bill had already been shot when she was awoken and he was lying next to her in bed.

The fact the motion court was aware of details regarding Prewitt's trial does not prove improper bias. Many judges hearing post-conviction motions are the same judges who presided over trial and also sentenced a movant. A judge may even be tasked with ruling on his or her own alleged errors in a post-conviction motion. Our Supreme Court has noted that a judge presiding over both the trial and post-conviction hearing is better equipped to assess the strengths and possible weaknesses of the trial in ruling on the post-conviction motion. *State v. Wells*, 804 S.W.2d 746, 749 (Mo. banc 1991). Here, the motion court judge did not preside over the trial but was aware of the trial and apparently observed parts of it. This alone is insufficient to suggest improper bias requiring recusal from ruling on the post-conviction DNA motion.

### Conclusion

The motion court's findings of fact and conclusions of law denying Prewitt's motion for DNA testing are not clearly erroneous. The court considered the impact exculpatory DNA would have on the jury, properly considered the probability under Section 547.035 that Prewitt would not have been convicted if exculpatory results had been obtained through the requested DNA, and did not rely on factual errors and extrajudicial information in reaching its decision. Prewitt's point on appeal is denied.

We affirm the circuit court's judgment.

_____
Anthony Rex Gabbert, Judge

All concur.